AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>All money, funds, credits, and assets, held in or<br>attributable to, Robinhood Financial, LLC Account<br>Number 156749202 | )<br>)<br>)<br>)<br>)    Case No.   **25mj0552** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Southern_____ District of _____California_____ is subject to forfeiture to the United States of America under ___18___ U.S.C. § ___981(a)(1)(A),___ 21 U.S.C. §§853(a)(1) and 881(a)(6), and 18 U.S.C. § 982(a)(1). *(describe the property)*,

All money, funds, credits, and assets, held in or attributable to, Robinhood Financial, LLC Account Number 156749202.

Please liquidate account and remit funds to the United States Marshals Service.

The application is based on these facts:
See attached affidavit which is incorporated by reference.

☑ Continued on the attached sheet.

_____*Granta Huff*_____
*Applicant's signature*

Grants Huff, FBI TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___cellular telephone___ *(specify reliable electronic means)*.

Date: ___2/6/2025___

_____*Allison H. Goddard*_____
*Judge's signature*

City and state:  San Diego, Califorina

Hon. Allison H. Goddard, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT

I, Grants Huff, being duly sworn, declare and state:

## I.

## BACKGROUND AND EXPERIENCE

1.     I am a peace officer employed by the San Diego Police Department (SDPD) and have been so employed since 2016. I am currently assigned as an FBI Task Force Officer (TFO) with the Violent Crimes Task Force–Gang Group (VCTF-GG), a multi-agency task force focused on the investigation of organized crime, including criminal street gangs. I was previously assigned to SDPD's Street Narcotics Unit as a detective. As an FBI Task Force Officer, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).   I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.     In the course of my employment, I received twelve hours of narcotics training at the San Diego Regional Police Academy and an additional four-hour narcotics class (11550 Made Easy) to further my expertise. I also received my Advanced P.O.S.T certificate and attended the 80-hour P.O.S.T certified ICI Narcotics Investigators Course.

3.     As a peace officer, I have investigated illicit controlled substance trafficking in San Diego, California, and surrounding areas. I have made or been directly involved with more than 200 arrests for narcotics-related charges. I have spoken with drug addicts and dealers about how they obtain their drugs and numerous ways they sell drugs. These conversations included discussions about the drugs themselves, prices, packaging methods, techniques used to avoid detection by police, and helped me familiarize myself with the jargon and slang used by dealers and addicts to discuss drugs and the sales of drugs. I have also worked in an undercover capacity in which I have purchased various narcotics from street-level dealers. Based on my training and experience, I have become familiar with the ordinary meaning of controlled substance slang and jargon, and I am familiar with the manners and am keenly aware of the mannerisms and methods of operation utilized by

1    persons involved in narcotics-related offenses and have developed specific expertise in the
2    area of criminal narcotics-investigations.

3        4.    I know, based on my training, experience, and knowledge of the investigation,
4    that those involved in drug trafficking often use their personal vehicles to facilitate their
5    crimes. For example, those involved in drug trafficking may use their personal vehicle to
6    mail controlled substances and to pick up controlled substances from a stash house or other
7    location.

8        5.    The facts set forth in this affidavit are based on my own personal knowledge;
9    knowledge obtained from other individuals during my participation in this investigation,
10   including other law enforcement officers; my review of documents and records related to
11   this investigation; communications with others who have personal knowledge of the events
12   and circumstances described herein; and information gained through my training and
13   experience. Because this affidavit is submitted for the limited purpose of establishing
14   probable cause in support of the application for seizure warrants, it does not set forth each
15   and every fact that I or others have learned during the course of this investigation.

16                                    **II.**
17                        **PURPOSE OF WARRANT**

18       6.    This affidavit supports an application for a warrant to seize all money and
19   funds **(Target Funds)** located in Robinhood Financial account number 156749202
20   (**Target Account).** I believe that the funds deposited into the **Target Account** are
21   properties constituting and derived from the proceeds traceable to the sale and distribution
22   of a controlled substance, and are subject to forfeiture pursuant to Title 21, United States
23   Code Sections 853(a)(1) and 881(a)(6). Additionally, I believe the **Target Funds** in the
24   **Target Account** are property involved in money laundering in violation of Title 18, United
25   States Code Section 1956(a)(1)(B)(i), rendering the entire contents of the **Target Account**
26   subject to seizure and forfeiture pursuant to Title 18, United States Code, Sections
27   981(a)(1)(A) and 982(a)(1).

28

7.      On December 3, 2024, the Honorable Michelle M. Pettit, United States Magistrate Judge, Southern District of California, issued a warrant authorizing the seizure of the **Target Funds** from the **Target Account**. The warrant commanded the execution of the warrant within 14 days from the date of issuance, that is, by December 17, 2024. Due to a misunderstanding between the investigating agents and the assisting attorneys, however, the warrant was not served during the authorized period. On February 5, 2025, a Robinhood Financial employee confirmed that the account remains active and contains funds.

8.      Based on the investigation to date, including surveillance conducted by law enforcement, Algernon Legrand LUNDY purported to operate a non-profit organization, Educational Support Center. According to its website, educationsupportcenter.org, which I last visited on November 14, 2024, the organization "offer(s) support for anyone who wants to free their lives from drug and/or alcohol addiction [and] a program that helps the youth understand the real effects of drugs."

9.      During surveillance on multiple occasions, law enforcement witnesses LUNDY arriving to the business location late in the afternoon and leaving shortly thereafter. Law enforcement did not identify any activity consistent of with lawful business operations. Furthermore, based on the investigation to date, including surveillance conducted by law enforcement, and review of LUNDY's cellphone, I believe there is probably cause that LUNDY is involved in drug trafficking activities. [1]

10.     On November 20, 2024, a Federal Grand Jury returned an indictment charging LUNDY with knowingly and intentionally possessing with the intent to distribute 400 grams or more, to wit: approximately 493.1 grams, of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide (commonly known as fentanyl), a Schedule II Controlled Substance; in violation of Title

---

[1] On September 16, 2024, the Honorable Michelle M. Petit, United States Magistrate Judge, Southern District of California, authorized warrants to search the cell phone taken from LUNDY on July 24, 2024, in case number 3:24-MJ-03611.

21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(vi) and for knowingly and intentionally possessing with the intent to distribute 5 grams and more, to wit: approximately 28.6 grams of methamphetamine (actual), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii)[2].

11.    On November 19, 2024, the Honorable Allison H. Goddard, U.S. Magistrate Judge authorized search and seizure warrants for 6 properties associated with LUNDY's criminal activity, *see* 24MJ4360 through 24MJ4366. One of the locations searched was LUNDY's business location for Education Support Center.

12.    On November 21, 2024, law enforcement executed search warrants at the six locations described above. As a result of the search warrant, law enforcement found approximately three kilograms of suspected fentanyl, two mechanical and electronically operated kilogram presses, and approximately $16,000 US currency. Additionally, suspected fentanyl residue was discovered inside the office space belonging to LUNDY's "Education Support Center". While there were several boxes of feminine hygiene and baby products discovered at the property, it did not appear that the property was at the time of the search warrant being used to distribute said products. Law enforcement also discovered a suspected clandestine manufacturing and packaging drug operation at one of the locations, including packaged suspected kilograms of fentanyl and two mechanical and electronically operated kilogram presses coated in suspected fentanyl among other tools used to cut, press, and package large quantities of powdered narcotics.

13.    As discussed above, numerous hours of surveillance by agents during the investigation and prior to the service of the search warrants revealed no significant foot traffic into the business. During the surveillance, agents routinely observed LUNDY traveling back and forth between the Education Support Center and 7614 Lemon Avenue. Based on the observations and items discovered during the search warrant, it is believed

---

[2] *See* 24-CR2470-TWR

1  LUNDY was not using the Education Support Center as a legitimate business, but as a
2  location to assist in his illegal drug operation

3      14.    I submit that there is probable cause to believe that all money and funds on
4  deposit in the **Target Account**, are forfeitable to the United States on multiple grounds.
5  (1) Pursuant to Title 21, United States Code Sections 853(a)(1) and 881(a)(6), any property,
6  real or personal, which constitutes or is derived from proceeds obtained directly or
7  indirectly as the result of the violations, traceable to the sale or distribution of a controlled
8  substance, or conspiracy to commit such offense is subject to forfeiture to the United States
9  and, (2) Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1) provides for
10  forfeiture to the United States of all property, real or personal, involved in or traceable to
11  a money laundering transaction or attempted transaction in violation of the offense of Title,
12  18, United States Code Section 1956(a)(1) [Laundering of Monetary Instruments] and
13  (3) pursuant to Title 18, United States Code, Section 981(a)(1)(C) as any property, real, or
14  personal, which constitutes or is derived from proceeds traceable to such violations or any
15  offense constituting a specified unlawful activity, or a conspiracy to commit such offense.

16                                    **III.**
17                          **APPLICABLE AUTHORITY**

18      15.    Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1) provides
19  for the forfeiture of any property, real or personal, involved in a transaction or attempted
20  transaction in violation of Title 18, Sections 1956, 1957 or 1960 or any property traceable
21  to such property. Title 18, United States Code, Section 981(a)(1)(C) provides for the
22  forfeiture of any property, real or personal, which constitutes or is derived from proceeds
23  traceable to a violation of any offense, or a conspiracy to commit such offense, which
24  constitutes a "specified unlawful activity," as defined in Title 18, United States Code,
25  Section 1956(c)(7), which also incorporates Title 18, United States Code, Section 1961(1).
26  Title 18, United States Code, Sections 1967(c)(7) and 1961(1) include drug trafficking
27  violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963.
28

5

16.    <u>Criminal Drug Forfeiture.</u> Title 21, United States Code, Section 853(a) provides any person convicted of a violation of this subchapter or subchapter II punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of state law-

(1)    any property constituting, or derived from, any proceeds the person obtained, directly, or indirectly, as the result of such violation;

(2)    any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

17.    <u>Rebuttable Presumption.</u> Title 21, United States Code, Section 853(d), provides there is a rebuttable presumption at trial that any property of a person convicted of a felony under this subchapter or subchapter II is subject to forfeiture under this section if the United States establishes by a preponderance of the that—

(1)    such property was acquired by such person during the period of the violation or this subchapter or subchapter II or within a reasonable time after such period; and

(2)    there was no likely source for such property other than the violation of this subchapter or subchapter II.

18.    <u>Civil Drug Forfeiture.</u> Title 21, United States Code, Section 881(a)(6) allows for the forfeiture of all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

19.    Title 18, United States Code, Section 981(a)(1)(C) provides for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense, or a conspiracy to commit such offense, which constitutes a "specified unlawful activity," as defined in Title 18, United States Code, Section

1956(c)(7), which also incorporates Title 18, United States Code, Section 1961(1). Title 18, United States Code, Sections 1967(c)(7) and 1961(1) include drug trafficking violations of Title 21, United States Code, Sections 841, 846, 952, 960, and 963.

20.    <u>Money Laundering</u>. Title 18, United States Code, Section 1956(a)(1)(B)(i) prohibits any person, whoever knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity —

(B)    knowing that the transaction is designed in whole or in part —

(i)    to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

21.    <u>Civil Money Laundering Forfeiture</u>. Title 18, United States Code, Section 981(a)(1)(A) provides for the civil forfeiture of any property, real or personal, that is involved in a transaction or attempted transaction in violation of Title 18, United State Code, Sections 1956, 1957, and 1960.

22.    <u>Criminal Money Laundering Forfeiture</u>. Title 18, United States Code, Section 982(a)(1) provides for the criminal forfeiture of any property, real or personal, that is involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956, 1957, and 1960.

23.    <u>Civil and Criminal Seizure Authority</u>. Title 18, United States Code, Section 981(b)(2) provides that a seizure may be made pursuant to a warrant obtained in the same manner as a search warrant. Title 18, United States Code, Section 981(b)(3) provides that notwithstanding the provisions of Rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b), and pursuant to Title 28, United States Code, Section 1395, may be executed in any district in which the property is found.

24.    Title 18, United States Code, Section 982(b)(1) provides that seizure warrants issued for money laundering violations of Title 18, United States Code, Sections 1956 and 1957 shall be governed by the provisions of Title 21, United States Code, Section 853. Title 21, United States Code, Section 853 also provides for seizure authority for Title 21 drug trafficking violations.

25.    Title 21, United States Code, Section 853(f) allows the United States to request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant. Title 21, United States Code, Section 853(f) further provides that if the Court determines there is probable cause to believe that the property is subject to forfeiture and that an order under Title 21, United States Code, Section 853(e) may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.

26.    Seizing the **Target Funds** will ensure that the contents are not withdrawn, moved, dissipated, or otherwise put beyond the reach of law enforcement. Accordingly, I submit that a protective order under Title 21, United States Code, Section 853(e) is insufficient to ensure the availability of the **Target Funds** for seizure and forfeiture at a later date. A seizure warrant, as opposed to a protective order, will secure the **Target Funds** for forfeiture in the event of conviction. In my experience, protective orders fail to provide the same effect as a seizure warrant because protective orders must be processed by a financial institution. This requires input and action by multiple layers of administration in the financial institution. As a result, there have been recent instances where the administrative procedures by a financial institution were incomplete or untimely and contents of accounts were dissipated. In addition, the requirement for a finding with respective to the insufficiency of a restraining order applies only to the request for a warrant for criminal forfeiture under Title 21, United States Code, Section 853 and 18, United States Code, Section 982, but not to the request for a warrant based on civil forfeiture under

Title 21, United States Code, Section 881 and Title 18, United States Code, Section 981—both of which provide grounds to seize the **Target Funds**.

27.    Accordingly, I believe that there is probable cause for the issuance of the requested seizure warrant for the **Target Funds**.

# IV.

## OVERVIEW OF DRUG INVESTIGATION

### Background of Investigation

28.    Detectives with SDPD's Narcotics Street Team arrested LUNDY for transportation of fentanyl and methamphetamine for sale on February 2, 2023. The detectives found LUNDY with approximately 493.1 grams of fentanyl, most of which had been dyed purple, and approximately 28.6 grams of methamphetamine. LUNDY was released on bail shortly after his arrest. He later pleaded guilty to the violations on March 6, 2024. LUNDY was sentenced to a suspended term of four years' jail with the imposition of a two-year term of formal probation. LUNDY's term of probation was initiated on April 15, 2024, and is expected to end on April 14, 2026. As a condition of his probation, LUNDY is required to submit his person, vehicle, residence, property, personal effects, computers, including electronic devices, to a search at any time, with or without a warrant, and with or without reasonable cause, when requested by a probation officer or law enforcement officer.

29.    In August 2023, while LUNDY's criminal case was pending, a then-member of San Diego's Neighborhood Crips gang met with the SDPD detectives[3]. He identified LUNDY as a large-volume drug dealer. According to the individual, LUNDY was selling kilogram-quantities of fentanyl and "pounds and pounds" of methamphetamine and heroin. The individual added that LUNDY "caught a case" in either late January or early February 2023—referring to LUNDY's criminal case—but was continuing to sell drugs while released on bail. The individual said LUNDY was selling fentanyl he received from Mexico

---

[3] The individual met with detectives to discuss potential cooperation. The individual has prior convictions for felony terrorism in 1994 and drug trafficking in 2013, 2019, and 2004. Investigators have corroborated the individual's statements as described herein and believe those statements to be credible.

with "Maserati" and "Apple" imprints/logos and even purple product (believed to be in reference to purple fentanyl). The individual also said LUNDY uses public commercial establishments to meet and distribute drugs and has a "non-profit organization, having something to do with children, and he and his wife have an office for this non-profit."

**LUNDY Used a Non-Profit Organization and Casinos to Launder Money**

30.    According to a publicly accessible Linked-In account in his name, LUNDY purports to operate a non-profit organization, Educational Support Center. According to its website, educationsupportcenter.org, which I last visited on November 14, 2024, the organization "offer(s) support for anyone who wants to free their lives from drug and/or alcohol addiction [and] a program that helps the youth understand the real effects of drugs."

31.    Agents surveilled LUNDY at the business address for Educational Support Center on numerous occasions between June and October 2024. Agents saw LUNDY at the business address on at least 10 occasions, many of which involved LUNDY arriving late in the afternoon and leaving shortly thereafter. Agents did not identify any activity consistent with lawful business operations at during the periods of surveillance.

32.    As stated in paragraph 11, on November 21, 2024, law enforcement executed search warrants at the six locations, including LUNDY's business location for Educational Support Center. As a result of the search warrant, law enforcement found approximately three kilograms of suspected fentanyl, two mechanical and electronically operated kilogram presses, and approximately $16,000 US currency at the six locations. Additionally, suspected fentanyl residue was discovered inside the office space belonging to LUNDY's "Education Support Center". While there were several boxes of feminine hygiene and baby products discovered at the property, it did not appear that the property was at the time of the search warrant being used to distribute said products.

33.    In addition, on at least three occasions in April and May 2024, LUNDY visited the Harrah's Resort casino in Valley Center, California, where he exchanged more than $20,000 for casino credits each time (totaling approximately $65,000). On August 31, 2024,

1  LUNDY again visited the Harrah's Resort casino in Valley Center, California, where he

2  exchanged $36,365 in cash for casino credits.

3       34.    Based on the investigator's review of JPMorgan Chase records, I am aware

4  that LUNDY opened business checking account x9996 in the name of Education Support

5  Center on October 5, 2018. LUNDY and his wife, S. Lundy were signors on the account.

6  Between January 1, 2023 and November 6, 2023, the account deposits totaling $188,066.50

7  were comprised of $118,824 in cash deposits. The remaining deposit balance came from a

8  check payable to S. Lundy, as payment for a false claims settlement.

9       35.    During that same period, the deposited funds were used for ATM withdrawals,

10  transfers to personal accounts, miscellaneous expenses (retail, food, entertainment), rent

11  payments (for the non-profit's registered address), and payments to an India-based software

12  company, AIS Technolabs PVT LTD. A majority of the ATM withdrawals occurred using

13  a debit card in LUNDY's name at San Diego-based casinos Jamul Casino and Harrah's

14  Resort.  A second card was issued in the name of his wife, S.L[4]., and although it was used

15  less frequently, the debit card in S.L.'s name was often used for ATM withdrawals on the

16  same date and at the same location as withdrawals made using LUNDY's card, suggesting

17  the same person may have been using both cards.

18       36.    Based on the investigator's review of JPMorgan Chase records, I am aware

19  that LUNDY opened personal checking x3815 on June 22, 2009. LUNDY is the sole signor

20  on this account. Between January 1, 2023 and September 28, 2023, the account deposits

21  totaling $55,066.58 were comprised of $25,510 in cash deposits and $22,560 in transfers

22  from LUNDY's business account for Educational Support Center. The remaining deposit

23  balance came from the sale of tickets on Stubhub or Seatgeek and 3 deposits from the State

24  of California In-Home Supportive Services.

25

26

27  [4] During the investigation, law enforcement discovered LUNDY's wife, Sonia Lundy, was collecting
   California Department of Health Care Services Homeless Benefits. They also did not find any evidence
28  that she is gainfully employed.

37.    During that same period, the deposited funds were used for payments to creditors, payments to an attorney, ATM cash withdrawals, retail purchases, and transfers to the **Target Account**.

38.    LUNDY transferred $8,220.00 from his personal JPMorgan Chase x3815 account to the **Target Account**. Based on LIBR tracing[5], $6,876.72 of the amount transferred to the **Target Account** are proceeds obtained directly or indirectly as the result of the violations, traceable to the sale or distribution of a controlled substance, or conspiracy to commit such offense is subject to forfeiture to the United States.

39.    Based on a review of BMO Bank records, I am aware that LUNDY opened a personal savings account x4252 and personal checking account x0477 on September 29, 2023. LUNDY is the sole signer on both accounts.

40.    Between September 29, 2023 and August 22, 2024, the account deposits totaling $108,837 were comprised of $96,237 in cash deposits and the remaining deposits were transfers from LUNDY's BMO Bank savings account x4252[6].

41.    During that same period, the deposited funds were used for payments to creditors, payments to an attorney, ATM cash withdrawals, retail purchases, and transfers to the **Target Account**.

---

[5] "The LIBR is an accounting principal used to calculate which funds are subject to forfeiture in an account containing both tainted and legitimate funds. The LIBR posits that when commingled funds are in an account, legitimate funds are withdrawn first, leaving the tainted funds in the account. When there is insufficient legitimate funds to cover a specific withdraw, then tainted funds are used to cover the withdraw. The balance of tainted funds in the account is reduced according to the amount needed to make the withdraw. This reduced balance of tainted funds is considered the intermediate balance of the tainted funds. If legitimate funds are added to the account later, the intermediate balance of tainted funds in the account does not increase. Over the course of time, as deposits and withdraws are made into an account, the LIBR keeps track of the intermediate balance of tainted funds in the account." *United States v. Haleamau*, 887 F. Supp. 2d 1051, 1057 (D. Haw. 2012) (citing *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159 (2nd Cir. 1986)) (internal citations omitted).

[5] LUNDY's California Credit Union savings account deposits were comprised of cash deposits and deposits from an unknown source because the bank did not provide detail of the source of funds.

[6] LUNDY's BMO Bank savings account deposits, during the same time period, were comprised of cash deposits.

42.    During the same time period, LUNDY transferred $59,500 from his BMO personal checking account x0477 to the **Target Account.** The total amount transferred to the **Target Account** are from LUNDY's cash deposits, rendering all transfers to the **Target Account** from BMO Bank proceeds obtained directly or indirectly as the result of the violations, traceable to the sale or distribution of a controlled substance, or conspiracy to commit such offense is subject to forfeiture to the United States.

43.    Based on a review of California Credit Union records, I am aware that LUNDY opened a personal savings account x9469 and personal checking account x9478 on September 29, 2023. Between December 2023 and October 2024, the account deposits totaling $126,084.96 were comprised of $112,346.22 in cash deposits, $8,138.74 in transfers from his California Credit Union savings account[7], and $5,000 credit from Harrah's Casino.

44.    During the same time period, LUNDY's deposited funds were used for cash withdrawals at casinos, retail and food purchases, Cash App transactions, and transfers to the **Target Account.** LUNDY also used $6,000 in illicit proceeds to pay towards the purchase of a vehicle at Ball Kia.

45.    During the same time period, LUNDY transferred $60,786.00 from his personal California Credit Union checking account to the **Target Account.** Based on LIBR tracing, $60,785.71 of the amount transferred to the **Target Account** are proceeds obtained directly or indirectly as the result of the violations, traceable to the sale or distribution of a controlled substance, or conspiracy to commit such offense is subject to forfeiture to the United States.

46.    Investigators have not identified any bank accounts associated with LUNDY that reflect income or spending consistent with lawful employment.

---

[7] LUNDY's California Credit Union savings account deposits, during the same time period, were comprised of cash deposits and deposits from an unknown source because the bank did not provide detail of the source of funds.

47.     Based on my training and experience, I am aware that criminals will attempt to conceal the source of illicit proceeds through cash deposits into accounts purported to be used for legitimate purposes. Based on my investigation in this case, including the absence of business activity at Education Support Center and the use of the deposited funds, I do not believe LUNDY's cash deposits were on behalf of the non-profit organization. Instead, I believe that LUNDY was depositing criminal proceeds through cash deposits that he identified as being on behalf of the non-profit organization in an attempt to conceal the nature of the proceeds. LUNDY's use of drug proceeds to pay for his business location rent is in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i). Additionally, LUNDY's use of his business bank account to deposit cash proceeds derived from the sale or distribution of a controlled substance is in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i). Based on my investigation, which is discussed further below, I believe that the cash deposits are proceeds traceable to the sale or distribution of a controlled substance, or conspiracy to commit such offense and are subject to forfeiture to the United States.

**LUNDY's Illegal Drug Activity**

48.     During the course of this investigation, agents surveilled LUNDY on numerous occasions. Below is an example of what was seen during surveillance.

49.     During a period of surveillance on July 1, 2024, at around 4:10 p.m., investigators watched LUNDY leave the business address for Education Support Center and drive to 7614 Lemon Avenue Lemon Grove, California 91945. After about 15 minutes, LUNDY left and drove to a nearby CVS, where he parked near a Mercedes Benz sedan and got inside the sedan. After about seven minutes, LUNDY returned to his car and drove back to Education Support Center.

50.     Based on my training and experience, I recognized LUNDY's conduct, briefly meeting with another individual in a vehicle in a business parking lot, to be consistent with drug trafficking.

14

51.    Around 5:37 p.m., LUNDY left Education Support Center and drove to the vicinity of 103 and 107 Roosevelt Avenue, National City, California 91950, where he parked. The same Mercedes Benz sedan was also parked at the location. According to the California Department of Motor Vehicles, the Mercedes Benz sedan is registered to Alvin Austin LUCIOUS at 103 Roosevelt Avenue, National City, California 91950. Based on my review of LUCIOUS's criminal history records, I am aware that LUCIOUS was previously convicted of possession of narcotics for sale in 2019.

52.    On July 12, 2024, investigators set up surveillance near 103 and 107 Roosevelt Avenue, National City, California 91950. Around 4:52 p.m., investigators watched LUCIOUS arrive in the sedan and park nearby. Investigators were able to identify LUCIOUS as the driver of the sedan based on their review of prior official government photos of LUCIOUS.

53.    According to San Diego Police Department arrest and contact records, between May 2023 and November 2024, law enforcement officers seized fentanyl in the general vicinity of 107 Roosevelt Avenue, National City, California 91950 approximately eight times. In at least two of those seizures, the fentanyl was dyed purple. On August 11, 2024, for example, SDPD officers contacted and subsequently arrested Stephen Clark WYNNE approximately four blocks away from this location. At the time, WYNNE had a clear plastic bag containing fentanyl that had been dyed purple and blue inside of this car. During a period of surveillance at this location on October 2, 2024, at around 4:32 pm, agents watched as WYNNE parked near this location, walked to the front door of LUCIOUS's place, and met with LUCIOUS briefly. WYNNE drove away about 15 minutes later.

54.    SDPD officers stopped LUCIOUS while he was driving his Mercedes Benz sedan near 103 Roosevelt Avenue, National City, California 91950 on October 24, 2024, at 8:20 p.m. During a search of the sedan, the officers found tin foil with powdered fentanyl inside of the glove compartment. During a search LUCIOUS, the

officers found a clear plastic baggie holding five packaged tin foil bindles of powdered fentanyl—that appeared to have been packaged for further distribution—as well of $269 in cash.

55.     Based on my experience investigating drug dealing in San Diego and conversations with other law enforcement officers, I am aware that seizures of purple fentanyl are rare. Based on my investigation in this case, I believe that LUCIOUS works for LUNDY as a lower-level dealer. I further believe that LUNDY and LUCIOUS sell fentanyl, specifically fentanyl that has been dyed blue or purple, in the vicinity of 103 and 107 Roosevelt Avenue, National City, California 91950, including to WYNNE, that LUCIOUS lives at 103 Roosevelt Avenue, National City, California 91950 and that LUNDY maintains 107 Roosevelt Avenue, National City, California 91950 in furtherance of his drug dealing activities

56.     During a period of surveillance on November 16, 2024, at around 4:05 p.m., investigators saw LUNDY walked out of 7614 Lemon Avenue, Lemon Grove, California 91945 at 4:50 p.m. He appeared to be looking around the area for a moment before getting in the Kia Soul and driving away. LUNDY drove to his business location, Support Center and went upstairs to his office. He walked back out of the office carrying a large box and a bag that he loaded into his car and returned to his office. He drove away around 5:30 and pulled to the curb in a commercial area nearby a few minutes later. There, LUNDY engaged with a female pedestrian for a moment before driving back to 7614 Lemon Avenue, Lemon Grove, California 91945. Surveilling agents were unable to see whether LUNDY engaged in an exchange with the pedestrian but noted that the timing was consistent with a quick drug deal. When LUNDY returned to the Lemon Grove address, he retrieved the box from his car and carried it into the location. He left again 10 minutes later without the box.

57.     After walking out of the Lemon Grove address, LUNDY sat in his car for about 20 minutes. He then got out of the car, walked to the corner, where he appeared to be looking around, then returned to the Lemon Grove address. LUNDY went inside for

less than 10 minutes, got back in his car, and drove away. LUNDY drove to a parking lot in the College Grove area, where he parked and got into a Chevrolet sedan that is registered to I.Z. Based on my review of I.Z.'s criminal history records, I am aware that I.Z. has numerous prior convictions for drug sales, most recently on September 20, 2024. LUNDY returned to his car eight minutes later and drove to another business parking lot in Spring Valley, California. LUNDY left the parking lot quickly.

58.    Based on my background, training, experience, and investigation in this case, I believe that LUNDY was engaging in drug dealing. Specifically, I believe LUNDY retrieved drugs from the Lemon Grove address that he delivered to I.Z. I further believe that LUNDY was attempting to detect law enforcement surveillance when he remained in his car outside of the Lemon Grove address, got out and walked to the corner to look around, and when he drove into the business parking lot in Spring Valley before quickly leaving.

59.    Investigators found LUNDY's Kia Soul parked outside of his business location, Education Support Center around 6:48 p.m. They then watched LUNDY retrieve multiple boxes and bags from the location that he loaded into his car before driving to LUCIOUS' residence. LUNDY remained at LUCIOUS' residence for just over a half hour before driving away. As he was driving, LUNDY appeared to perform several maneuvers intended to detect law enforcement surveillance. Specifically, LUNDY would pull to a curb then drive away after a short period, make U-turns in parking lots, drive into the cul-de-sacs, stop in the middle of the street, and leave areas but return shortly thereafter.

60.    Based on my background, training, experience, and investigation in this case, I believe that LUNDY suspected law enforcement might be following him and was taking active measures to thwart law enforcement surveillance. Based on LUNDY's probationary status, I further believe he was removing incriminating materials from his business location and relocating those materials to other places, including LUCIOUS' residence and the Lemon Grove address.

61.    Based on my training, experience, and investigation in this case, I believe that LUNDY maintains the Lemon Grove address in furtherance of his drug dealing. Given his frequent, otherwise inexplicable trips between his business location and the Lemon Grove address, and his pattern of making brief stops at the Lemon Grove address before going to other locations associated with LUNDY's suspected drug dealing activities, I believe LUNDY keeps contraband at this location to avoid law enforcement detection and probationary searches of the location.

**V.**

**TARGET ACCOUNT AND FORFEITURE**

62.    The **Target Account** received proceeds traceable to the sale or distribution of a controlled substance, or conspiracy to commit such offenses against the United States. I have reviewed the Robinhood records for the **Target Account.**

63.    A review of the account records for the **Target Account** reveals that LUNDY transferred funds from his JPMorgan Chase personal checking account, BMO Bank personal checking account and California Credit Union personal checking account. The source of the funds transferred to the **Target Account** were cash deposits made into all three personal checking accounts.

64.    Based on my training and experience, and the evidence in the investigation to date, LUNDY has no legitimate source of income, and based on Title 21, United States Code, Section 853(d), there is a rebuttable presumption at trial that any property of a person convicted of a felony under this subchapter or subchapter II is subject to forfeiture under this section if the United States establishes by a preponderance of the that (1) such property was acquired by such person during the period of the violation or this subchapter or subchapter II or within a reasonable time after such period; and (2) there was no likely source for such property other than the violation of this subchapter or subchapter II.

//

//

65.    Below is a chart to show the time period and flow of illicit proceeds into the **Target Account**:



**Robinhood Financial, LLC Account# 156749202**

66.    LUNDY entered into a brokerage agreement with Robinhood Financial, LLC Account# 156749202 (**Target Account)** on October 31, 2018. From January 1, 2023 to August 1, 2024, LUNDY deposited $128,506 into the **Target Account.** Based on LIBR tracing conducted on LUNDY's personal checking accounts and the rebuttable presumption, $125,162.43 is traceable to the sale or distribution of a controlled substance, or conspiracy to commit such offenses against the United States.

67.    On November 27, 2024, a representative with Robinhood Financial provided the government with a screenshot of LUNDY's current balance. As of November 27, 2024, the portfolio balance in the **Target Account** is approximately $140,684. Because this is a brokerage account the balance can increase and decrease based on the value of the stocks that the account has invested in. LUNDY also has approximately $3,039 in cryptocurrency. The money that LUNDY uses to purchase the cryptocurrency comes from his portfolio balance. Based on a review of the Robinhood Financial statements from January 1, 2023 through July 30, 2024, LUNDY's source of deposits on the account are solely from his personal checking accounts at JPMorgan Chase, BMO Bank, and California Credit Union. The source of funds in these three checking accounts are primarily from cash deposits.

Based on my training and experience and the investigation to date, there is probable cause to believe that the cash deposits are proceeds of the sale or distribution of a controlled substance or conspiracy to commit such offenses against the United States.

**V.**

**<u>CONCLUSION</u>**

68.     Based on my training and experience, and from the evidence obtained to date regarding LUNDY's criminal activity, I believe that the money and funds on deposit in the **Target Account** are proceeds of the sale or distribution of a controlled substance, or conspiracy to commit such offenses against the United States. Accordingly**,** the **Target Account** is subject to forfeiture as proceeds pursuant to Title 21, United States Code Sections 853(a)(1) and 881(a)(6).

69.     Additionally, I believe the **Target Funds** in the **Target Account** are property involved in money laundering in violation of Title 18, United States Code Section 1956(a)(1)(B)(i), rendering the entire contents of the **Target Account** subject to seizure and forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1).

//

//

70. By reason of the above, I respectfully request that the Court issue a seizure warrant for all money and funds on deposit in the **Target Account.** In addition, I respectfully request that the **Target Account** seizure warrant contain instructions to seize, liquidate, and remit funds to the United States Marshals Service.

_Grants Huff_

_____

Grants Huff
FBI TFO

Subscribed and sworn to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4 on this 6th day of February 2025.

_____

Honorable Allison H. Goddard
United States Magistrate Judge

21